UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

HEMPCHAIN FARMS, LLC,

                                **Plaintiff,**

                 v.                                1:19-CV-1364
                                                        (FJS/CFH)

**KENNETH SACK, ORGANIC GROWERS
LLC, and EAGLE SPRINGS ORGANIC LLC,**

                                **Defendants.**
_____

**APPEARANCES**                           **OF COUNSEL**

**FREEMAN HOWARD, P.C.**               **PAUL M. FREEMAN, ESQ.**
441 East Allen Street
P.O. Box 1328
Hudson, New York 12534
Attorneys for Plaintiff

**PECKAR & ABRAMSON, P.C.**            **BRIAN D. WALTER, ESQ.**
1325 Avenue of the Americas               **PUJA SHARMA, ESQ.**
10th Floor
New York, New York 10019
Attorneys for Defendants

**SCULLIN, Senior Judge**

## I. INTRODUCTION

      Pending before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See* Dkt. No. 7.

## II. BACKGROUND[1]

This action arises out of Plaintiff's purchase of feminized hemp seed.  *See* Dkt. No. 1, Complaint, at ¶ 24.  Plaintiff's Chief Agricultural Officer, Nicolas Guarino, met with Defendant Sack and representatives of Defendants Organic Growers LLC and Eagle Springs Organic LLC ("Eagle Springs") in May 2019 at Defendants' farm.  *See id.* at ¶ 18.  Defendant Sack owns and operates Defendants Organic Growers and Eagle Springs.  *See id.* at ¶ 8.  Mr. Guarino explained to Defendant Sack that Plaintiff was only interested in purchasing feminized hemp seed with no hermaphrodites or male plant seeds.  *See id.* at ¶ 20.

Defendant Sack told Mr. Guarino that Defendants Organic Growers and Eagle Springs could produce feminized industrial hemp seeds with a germination rate greater than 90%.  *See id.* at ¶ 19.  Defendant Sack also explained to Mr. Guarino that the seeds were tested through the Colorado Department of Agriculture.  *See id.* at ¶ 22.  Furthermore, Defendant Sack informed Mr. Guarino that the seeds available for purchase met all industry standards for feminized seeds, including those in the Federal Seed Act and the Colorado Seed Act.  *See id.* at ¶ 19.  Defendant Sack repeatedly affirmed that the feminized hemp seed contained no male plant seeds or hermaphrodites.  *See id.* at ¶ 45.  Rather, Defendant Sack stated that the seeds produced high quality feminized plants with high CBD and low THC content.  *See id.*

After meeting with Mr. Guarino in May 2019, Defendant Sack had numerous follow up phone conversations with other representatives of Plaintiff located in New York.  *See id.* at ¶ 23.  During those conversations, Defendant Sack reassured Plaintiff's representatives that Defendant Organic Growers' seeds had a germination rate greater than 90% and met all industry standards.

---

[1] **The "facts" set forth in this section are based on the allegations that Plaintiff asserts in its complaint, which for purposes of this motion the Court must accept as true.**

2

*See id.* Based on Defendant Sack's statements, Plaintiff ordered 200,000 feminized seeds from Defendant Organic Growers (hereinafter the "Contract") on May 16, 2019.[2] *See id.* at ¶ 24.

The shipping label Defendant Organic Growers included with Plaintiff's order contained the following information about the seeds purchased:

> (1) The Colorado Department of Agriculture licensed Defendant Organic Growers to sell seeds under Seed Registration No. 0035CB from March 1, 2019, to April 28, 2020.
> (2) The variety of the feminized seed sold was "BB2 Cherry Mom and Wu #5".
> (3) The package date of the seeds was May 21, 2019.
> (4) A seed germination test was conducted on March 20, 2019.
> (5) The germination rate was 84%.
> (6) The percentage of dormant hard seed was 8%.
> (7) The percentage of noxious weed seed was 0%.
> (8) The percentage of other seed present was 0%.
> (9) The purity of the seeds was 96.42%.
> (10) The average number of seeds per pound was 33,500.
> (11) The flowering time for the seeds was listed as approximately 8 weeks.
> (12) "**NO WARRANTY** to the levels of THC in your hemp plants. We recommend you start testing your hemp plants around **WEEK 3** of flowering for best results."
> (13) "Possibility for intersex traits xx pollen progenitors/xx males. Walk the fields to remove any male plants."

*See* Dkt. No. 7-5.

The Colorado Seed Laboratory report also provided information to Plaintiff about the seeds:

---

[2] Plaintiff alleges Defendant Sack sent it a purchase order to confirm the sale of the seeds. *See* Dkt. No. 1 at ¶ 25. Plaintiff attached this document to its complaint. *See* Dkt. No. 1-1. Defendants clarified that the "purchase order" attached to Plaintiff's complaint is actually representative of the shipping label Defendants typically attach to each seed shipment. *See* Dkt. No. 7 at 8. However, Defendants claim the attachment to Plaintiff's complaint is actually an altered copy of the shipping label that Defendants included with Plaintiff's seed order. *See id.* Defendants attached the true shipping label to their motion to dismiss. *See* Dkt. No. 7-8. Plaintiff subsequently conceded the shipping label that Defendants presented was the true copy. *See* Dkt. No. 16 at 9, 12. Plaintiff admits that it did not receive the altered label, which it attached to its complaint, from any of the named Defendants. *See* Dkt. No. 16 at 5. Thus, the invoice Defendants submitted with their motion is the Contract between the parties. *See* Dkt. Nos. 7-3, 7-4.

>    (1) The testing was completed on March 26, 2019.
>    (2) The BB2 hemp seeds were tested.
>    (3) The germination rate was 84%.
>    (4) The percentage of dormant seed was 8%.
>    (5) The percentage of noxious weed seed was 0%.
>    (6) The percentage of other seed present was 0%.
>    (7) The purity of the seeds was 96.42%.
>    (8) The average number of seeds per pound was 33,077.

*See* Dkt. No. 7-7.

The seeds Plaintiff purchased did not reflect the quality Defendant Organic Growers represented orally and in writing on the shipping label. *See id.* at ¶ 55. In June 2019, Plaintiff discovered the purchased seeds yielded germination rates at or below 30%. *See id.* Plaintiff contacted Defendant Organic Growers, and it offered to supply 90,000 replacement seeds of the quality originally agreed on in the Contract. *See id.* at ¶ 56. Plaintiff accepted delivery of the replacement seeds. *See id.* at ¶ 57; Dkt. No. 7-5. However, the replacement seeds were overabundant with dormant seeds, riddled with male and hermaphrodite seeds, and yielded germination rates well below 90%. *See id.* at ¶ 58.

Plaintiff claims that it lost up to 75% of its crop and the cost of manpower necessary to remove the significant number of male plants in the fields. *See id.* at ¶ 59. Furthermore, Plaintiff claims a loss of biomass for use in the production of CBD oil, loss of revenue from the sale of CBD oil, and loss of revenue from the inability to produce CBD oil for resale to others. *See id.*

Based on these allegations, Plaintiff asserts the following four causes of action:

>    (1) Fraudulent misrepresentation for deceiving Plaintiff about the
>    true character and quality of the feminized seed they offered to
>    sell, s*ee* Dkt. No. 1 at ¶¶ 41-58;
>    (2) Breach of warranty pursuant to U.C.C. § 2-313, § 2-314, and
>    § 2-318 with regard to the first shipment of seeds, s*ee id.* at ¶¶ 61-
>    65; this cause of action includes claims based on breach of express

>warranty and breach of implied warranty of merchantability, s*ee id.* at ¶¶ 61, 63;
>(3) Failure to abide by the Federal Seed Act, *see id.* at ¶¶ 68-69; and
>(4) Failure to abide by the Colorado Seed Act, *see id.* at ¶¶ 72-74.

## III. DISCUSSION

A.      Claims under the Federal Seed Act and the Colorado Seed Act

### *1. Federal Seed Act*

Violation of a federal statute and harm caused to a party "'do[] not automatically give rise to a private cause of action in favor of that person.'" *Touche Ross & Co. v. Redington*, 442 U.S. 560, 568 (1979) (quoting *Cannon v. University of Chicago, . . .,* 441 U.S., at 688, 99 S. Ct., at 1953). The ultimate issue is whether Congress intended to create a private remedy under the statute, in this case the Federal Seed Act. *See Moorer v. Hartz Seed Co.*, 120 F. Supp. 2d 1283, 1293 (M.D. Ala. 2000) (quotation omitted). Thus, courts begin with the plain language of the statute and then turn to any legislative history. *See Agricola Cuyuma SA v. Corona Seeds, Inc.*, No. CV 17-8220 DMG (JPRx), 2018 WL 6185969, *7-*8 (C.D. Cal. Aug. 27, 2018). If Congress has been silent on the issue of whether a private right of action exists, implying such a right "is a hazardous enterprise, at best." *Redington*, 442 U.S. at 571 (citation omitted). Thus, when "the plain language of the [statute] weighs against the implication of a private remedy," it supports the decision that there is no private right of action. *Id.*; *Moorer*, 120 F. Supp. 2d at 1294; *Ren-Dan Farms, Inc. v. Monsanto Co.*, 952 F. Supp. 370, 374 (W.D. La. 1997); *Agricola Cuyuma SA,* 2018 WL 6185969, at *9*; Frontier AG, Inc. v. Nuseed Americas Inc.*, No. 18-2352-DDC-TJJ, 2019 WL 3219334, *4 (D. Kan. July 17, 2019).

The plain language of the Federal Seed Act does not state an express right to a private action, nor does it imply such a right. To the contrary, the Federal Seed Act provides that, for each violation "forfeiture shall be recoverable in a civil suit brought in the name of the United States." 7 U.S.C. § 1596(b). Based on this statutory language, the Court concludes that there is no private cause of action under the Federal Seed Act. Therefore, the Court grants Defendants' motion to dismiss Plaintiff's Federal Seed Act cause of action in its entirety.

### 2. Colorado Seed Act

In *Moorer* and *Agricola Cuyuma SA*, mentioned above, the courts applied the same analysis to the state seed laws, as they did to the Federal Seed Act, to determine whether those state statutes provided a private cause of action. *See Moorer*, 120 F. Supp. 2d at 1294; *Agricola Cuyuma SA*, 2018 WL 6185969, at *9. The courts looked to the plain language of the respective state statutes as well as any applicable case law and legislative history. *See Moorer*, 120 F. Supp. 2d at 1294 (holding "[n]o express cause of action is set up under the Alabama Code" and no case law or other source "suggest[ed] that an implied private cause of action exist[ed] under the Alabama seed laws"); *Agricola Cuyuma SA*, 2018 WL 6185969, at *9 (analyzing the California Seed Law). In *Agricola Cuyuma SA,* the court noted that the California Seed Law provided that "'[t]he secretary and . . . the commissioner of each county and the qualified representative of the commissioner, shall enforce th[e California Seed Law] and carry out its provisions and requirements." *Agricola Cuyuma SA*, 2018 WL 6185969, at *9. Therefore, the court concluded that, "[g]iven the Law's plain language and the California Legislature's evident intent to enforce the law through state actors, rather than private citizens," no private right of action existed. *Id.*

In this case, the plain language of the Colorado Seed Act is very similar to the language of the California Seed Act at issue in *Agricola Cuyuma SA*. It states that "the commissioner shall: (a) Administer and enforce the provisions of [the Colorado Seed Act]." Colo Rev. Stat. Ann. § 35-27-114. This language strongly indicates that the legislature intended state actors, not private citizens, to enforce the statute. In addition to this plain language, which does not expressly indicate a private right of action, neither Colorado case law nor legislative history suggests that there is a private cause of action under the Colorado Seed Act. Therefore, the Court grants Defendants' motion to dismiss Plaintiff's Colorado Seed Act claim in its entirety.

**B.      Standard of review for a motion to dismiss**

When considering a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the court must accept the material facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Interpharm, Inc. v. Wells Fargo Bank, Nat. Ass'n*, 655 F.3d 136, 141 (2d Cir. 2011) (citation omitted). A court should grant a motion to dismiss only if "'it appears beyond doubt . . . that the plaintiff can prove no set of facts that would entitle [it] to relief.'" *Sec. Inv. Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 68 (2d Cir. 2000) (quotation omitted).

Moreover, the court must limit its analysis to the four corners of the complaint when deciding the motion. However, the court may consider documents attached to the complaint as an exhibit or any documents incorporated by reference or integral to the complaint. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002). A document is integral to the complaint "where the complaint 'relies heavily upon its terms and effect[.]'" *Id.* (quoting *Int'l Audiotext*, 62 F.3d at 72).

In this case, Plaintiff and Defendants submitted numerous exhibits and affidavits in connection with Defendants' motion to dismiss. However, only four of those documents are either incorporated by reference or are integral to the complaint. Those documents are as follows:

> (1) The invoice that Defendants attached to their motion to dismiss, which documents the transaction for seeds between Plaintiff and Defendant Organic Growers, *see* Dkt. No. 7-3, 7-4;[3]
> (2) The actual shipping label that Defendant Organic Growers attached to Plaintiff's seed order, *see* Dkt. No. 7-8;[4]
> (3) The Colorado Seed Laboratory report, *see* Dkt. No. 7-7;[5] and
> (4) The invoice Defendant Organic Growers generated with regard to the 90,000 replacement seeds it sent to Plaintiff, *see* Dkt. No. 7-5.[6]

---

[3] As noted, the parties agree that the exhibit Plaintiff attached to its complaint was not a true purchase order, nor did Plaintiff receive it from Defendant Organic Growers. *See* Dkt. No. 16 at 4-5; Dkt. No. 7, at 8-9. However, the invoice that Defendants attached to their motion papers is integral to the complaint because Plaintiff relies heavily on that invoice as evidence of the Contract between Plaintiff and Defendant Organic Growers and that Contract is the sole basis for Plaintiff's claims.

[4] As noted, although Plaintiff provided a different copy of the shipping label as an exhibit to its complaint, Plaintiff subsequently agreed that the copy Defendants provided was the correct copy. *See* Dkt. No. 16 at 9. Plaintiff heavily relies on the shipping label because it contains many of the representations Plaintiff claims Defendant Organic Growers made regarding the seeds that Plaintiff purchased.

[5] Plaintiff heavily relies on this document to support its allegations regarding the testing conducted on the seeds. *See* Dkt. No. 1 at ¶¶ 37, 62, 68-69, 73-74. It also relies on this document to support its claims about the representations that Defendant Organic Growers made concerning the quality of the seeds. *See generally* Dkt. No. 1.

[6] Plaintiff incorporates this document by reference in its complaint. *See* Dkt. No. 1 at ¶¶ 56-57. Specifically, Plaintiff discusses how it reached out to Defendant Organic Growers when it discovered the 200,000 seeds it had initially purchased were not representative of the quality promised. *See id.* Plaintiff further alleges that Defendant Organic Growers sent it 90,000 replacement seeds at no extra cost. *See id.*

With regard to the other documents that the parties submitted to support their positions, the Court will not consider them because they are neither incorporated by reference nor integral to the complaint.[7]

## C.     Plaintiff's claim for fraudulent misrepresentation

To state a claim for fraudulent misrepresentation under New York law, a plaintiff must allege (1) "'a misrepresentation or material omission of fact,'" (2) the falsity of the representation, (3) knowledge of the party making the representation that it was false when made, (4) justifiable reliance by the plaintiff, and (5) resulting injury. *Mandarin Trading Ltd. v. Wildenstein*, 16 N.Y.3d 173, 178 (2011) (quotation and other citation omitted). A plaintiff cannot satisfy the justifiable reliance element if it "reli[ed] on representations it knew were false[.]" *Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 181-82 (2d Cir. 2007) (citation omitted) (interpreting New York law). Additionally, Rule 9(b) of the Federal Rules of Civil Procedure requires a plaintiff to plead fraud claims with particularity. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006). The complaint, therefore, must "'(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Id.* (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)).

Furthermore, under Rule 9(b), a plaintiff can generally plead malice, intent, knowledge, and other conditions of a person's mind. *See id.* (quoting Fed. R. Civ. P. 9(b)). However, a

---

[7] These documents include the following: (1) Affidavit of Nicholas Guarino and exhibits attached thereto, *see* Dkt. No. 13; (2) Affidavit of Evan Kennedy and exhibits attached thereto, *see* Dkt. No. 14; (3) Affidavit of Grant D. Orvis, Ph.D., *see* Dkt. No. 15; (4) Supplemental Affidavit of Kenneth Sack and exhibits attached thereto, *see* Dkt. No. 17; (5) Affirmation of Puja Sharma and exhibits attached thereto, *see* Dkt. No. 18; and (6) exhibits to Defendants' motion to dismiss, which are not otherwise discussed above, *see* Dkt. Nos. 7-2, 7-9.

plaintiff cannot base its fraud claims on "'speculation and conclusory allegations.'" *Id.* (quotation omitted). Rather, a plaintiff has to allege facts that give rise to a strong inference of fraudulent intent, which it can do "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'" *Id.* at 290-91 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)).

Finally, because Defendant Sack is the owner and operator of Defendants Organic Growers and Eagle Springs, he can be held liable for fraud in his individual capacity. New York law is clear that "corporate officers and directors may be held individually liable if they participated in or had knowledge of the fraud, even if they did not stand to gain personally[.]" *Polonetsky v. Better Homes Depot, Inc.* 97 N.Y.2d 46, 55 (2001) (citation omitted). Plaintiff alleges that Defendant Sack, as an owner, operator, and representative of Defendants Organic Growers and Eagle Springs, made specific oral representations regarding the seeds to Plaintiff's representative, Mr. Guarino. *See* Dkt. No. 1 at ¶¶ 8, 19.

In this case, Plaintiff has adequately pled all of the elements required to maintain his claim for fraudulent misrepresentation under New York law. With regard to the fist element, Plaintiff has sufficiently alleged representations of a material fact by outlining what those representations were, who made them, and when they were made. Plaintiff claims that Defendant Sack, as a representative of Defendants Organic Growers and Eagle Springs, made oral representations to its representative, Mr. Guarino, in May 2019 when he visited Defendant Eagle Springs' farm property. *See* Dkt. No. 1 at ¶¶ 18-19, 22. Allegedly, Defendant Sack indicated that Defendants Organic Growers and Eagle Springs could produce feminized hemp seed with a germination rate greater than 90% and that the seeds met all industry standards for

10

feminized seeds. *See id.* at ¶ 19. Plaintiff also alleges that Defendant Sack made the same representations to Plaintiff's other representatives over the phone following the May 2019 visit. *See id.* at ¶ 23. Furthermore, Plaintiff generally asserts that Defendants Organic Growers, Eagle Springs, and Sack represented the feminized seed contained no male plant seeds or hermaphrodites and that the seed could produce plants with high CBD and low THC content. *See id.* at ¶ 45. Additionally, Plaintiff claims Defendant Organic Growers made written representations regarding the seeds on the shipping label it attached to each bag of seeds. *See id.* at ¶ 46. These representations include seed germination rate and percentage of dormant hard seed. *See* Dkt. No. 7-8. Based on these allegations, the Court concludes that Plaintiff has sufficiently pled the first element of its fraudulent misrepresentation claim.

With regard to the second element, Plaintiff generally claims that, despite the written and oral representations of Defendants Organic Seed Growers and Sack, the seed was poor quality, had very low germination rates, and had excess dormant hard seed. *See id.* at ¶ 41. Specifically, Plaintiff claims the germination rates were 30% or below for the seeds it purchased. *See id.* at ¶ 55. Furthermore, Plaintiff alleges that the 90,000 replacement seeds Defendant Organic Growers sent to it were also inferior in quality, immature in development, overabundant with dormant seeds, riddled with male and hermaphrodite seeds, and yielded germination rates well below 90%. *See id.* at ¶ 58. Based on these allegations, the Court finds that Plaintiff has sufficient alleged the second element of its fraudulent misrepresentation claim.

With regard to the third element, Plaintiff has sufficiently pled that Defendants Organic Growers, Eagle Springs, and Sack had knowledge that the representations they made were false at the time they made them. Plaintiff has alleged facts to show that Defendants had motive and opportunity to commit fraud. Plaintiff alleges Defendants Organic Growers, Eagle Springs, and

11

Sack carried out their scheme to deceive Plaintiff into buying sub-quality feminized seed at market rates substantially higher than the actual value of the seed.  *See* Dkt. No. 1 at ¶¶ 41-42.  Plaintiff alleges that Defendant Sack owned, operated and controlled Defendants Organic Growers and Eagle Springs during the time Plaintiff contracted with Defendant Organic Growers for the purchase of seed.  *See id.* at ¶ 8.  Furthermore, Plaintiff alleges that Defendants Organic Growers, Eagle Springs and Sack were privy to confidential information that was not available to customers regarding their seed enterprise, including seed genetics, seed germination rates, farming and agricultural practices, and interactions with the Colorado Department of Agriculture.  *See id.* at ¶¶ 15-17.  Based on these factual allegations, the Court finds that Plaintiff has sufficiently pled the third element of its fraudulent misrepresentation claim.

With regard to the fourth element, Plaintiff asserts that that Defendant Organic Growers made written representations regarding the seeds on the shipping label.  Additionally, Defendant Sack, as the owner and operator of Defendants Organic Growers and Eagle Springs, made oral representations.  *See* Dkt. No. 1 at   ¶ 46.  Plaintiff claims it believed all the representations were true at the time they were made.  *See id.* at ¶ 50.  In addition, Plaintiff alleges that it would not have purchased hemp seeds from Defendant Organic Growers if it had known the truth about the inferior quality, significant number of male seeds, true germination rate, and low CBD content of the plants.  *See id.* at ¶¶ 51-53.

Plaintiff had no information to the contrary with regard to CBD content, inferior quality or significant number of male seeds.  Although the shipping label Plaintiff received with the shipment of seeds stated, "Possibility for intersex traits xx pollen progenitors/xx males.  Walk the fields to remove any male plants[,]"  *see* Dkt. No. 7-8, Plaintiff only received this information once the seed shipment arrived.  If, as Plaintiff alleges, Defendant Sack represented

12

that the seeds contained no male plants or hermaphrodites during Mr. Guarino's May 2019 visit, Plaintiff's reliance on those statements was reasonable. *See generally* Dkt. No. 1 at ¶ 20. Furthermore, the Colorado Seed Laboratory report, which Defendants provided to Mr. Guarino during his May 2019 visit, did not contain any information regarding the sex of the seeds. *See* Dkt. No. 7-7.

In addition, although Plaintiff had information to the contrary with regard to germination rate, this was only partial information. *See id.* If Defendant Sack orally represented the germination rate of the seeds was anything higher than 84%, Plaintiff could not reasonably rely on those statements because the Colorado Seed Laboratory report Plaintiff received indicated the germination rate was 84%. *See* Dkt. No. 1 at ¶ 19; Dkt. No. 7-7. However, Plaintiff could reasonably rely on the 84% germination rate indicated on the Colorado Seed Laboratory report.

Based on the facts as alleged in the complaint, the Court finds that Plaintiff has sufficiently pled the fourth element of its fraudulent misrepresentation claim.

Finally, with regard to the fifth element, Plaintiff claims that it suffered a loss of up to 75% of its crop and the cost of manpower that was necessary to remove the significant number of male plants in the fields. *See* Dkt. No. 1 at ¶ 59. Additionally, Plaintiff claims a loss of biomass for use in the production of CBD oil, loss of revenue from the sale of CBD oil, and loss of revenue from the inability to produce CBD oil for resale to others. *See id.* Based on these factual allegations, the Court finds that Plaintiff has sufficiently pled the fifth element of its fraudulent misrepresentation claim.

Moreover, despite Defendants' argument to the contrary, their misrepresentations were not expressions of future expectations. To constitute fraud, the misrepresentation on which the plaintiff relies "'must relate to a past or existing fact, or something equivalent thereto, as

13

distinguished from a mere estimate or expression of opinion.'" *Koagel v. Ryan Homes, Inc.*, 167 A.D.2d 822, 822 (4th Dep't 1990) (quotation omitted). "'[A] misrepresentation of a material fact which is collateral to the contract and serves as an inducement to enter into the contract is sufficient to sustain a cause of action sounding in fraud.'" *Gilpin v. Oswego Builders, Inc.*, 87 A.D.3d 1396, 1399 (4th Dep't 2011) (quotation omitted); *see also Coolite Corp. v. Am. Cyanamid Co.*, 52 A.D.2d 486, 488 (1st Dep't 1976) (holding defendant's misrepresentation that it was presently able to produce specific quantity of product was not merely a promise of future action). Finally, misrepresentation of a specific product gives rise to a fraud claim. *See First Bank of Americas v. Motor Car Funding, Inc.*, 257 A.D.2d 287, 292 (1st Dep't 1999) (citation omitted); *Tomkins PLC v. Bangor Punta Consol. Corp.*, 194 A.D.2d 493, 494 (1st Dep't 1993).

In this case, Defendant Sack's alleged misrepresentations were not expressions of future expectations. Those misrepresentations caused Plaintiff to enter into the Contract for the purchase of seeds. *See* Dkt. No. 1 at ¶¶ 51-53. Furthermore, Defendants made misrepresentations about the feminized hemp seeds, which are a specific product. *See id.* at ¶¶ 44-45. Additionally, Defendant Sack's misrepresentations are analogous to the defendant's misrepresentations in *Coolidge* regarding its present production capabilities. Defendant Sack allegedly told Mr. Guarino that Defendants Organic Growers and Eagle Springs were presently capable of producing feminized hemp seed with a germination rate greater than 90% and that the seeds met all industry standards for feminized seeds. *See id.* at ¶ 19. Thus, Defendants' misrepresentations were not expressions of future expectations and are sufficient to sustain a cause of action for fraud.

Accordingly, for the above-stated reasons, the Court denies Defendants' motion to dismiss Plaintiff's fraudulent misrepresentation claim.

**D.    Plaintiff's breach of warranty claims**

*1. Breach of warranty claims against Defendant Sack and Defendant Eagle Springs*

Although Plaintiff asserts its breach of warranty claims against all Defendants, under New York law, officers or directors of a company cannot be held individually liable for breach of a contract. *See Salzman Sign Co., Inc. v. Beck*, 10 N.Y.2d 63, 65 (1961). Therefore, the Court grants Defendants' motion to dismiss Plaintiff's breach of warranty claims against Defendant Sack.

In addition, Plaintiff only entered into a contract with Defendant Organic Growers for the purchase of seeds. Therefore, there is no basis for its breach of warranty claims against Defendant Eagle Springs. Accordingly, the Court grants Defendants' motion to dismiss Plaintiff's breach of warranty claims against Defendant Eagle Springs.

*2. Breach of warranty claims against Defendant Organic Growers*

Since Plaintiff contracted for the sale of goods, Article Two of the Uniform Commercial Code ("U.C.C.") governs Plaintiff's claims for breach of express warranty and implied warranty of merchantability. *See* N.Y. U.C.C. § 2-102. Section 2-313 specifically governs express warranties, providing that "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." N.Y. U.C.C. § 2-313(1)(b). Under New York law, "basis of the bargain" or reliance is satisfied when the plaintiff shows that the express warranty is part of the bargain between the parties. *See CBS Inc. v. Ziff-Davis Pub. Co.*, 75 N.Y.2d 496, 503 (1990).

In this case, Plaintiff alleges that the description of the goods was part of the bargain between the parties. *See* Dkt. No. 1 at ¶¶ 24, 51-53. Plaintiff's representative, Mr. Guarino, told

15

Defendant Sack that Plaintiff was looking for feminized seed with no males or hermaphrodites and that was up to industry standards. *See id.* at ¶ 20. Defendant Organic Growers and Defendant Sack, in his capacity as an officer of Defendant Organic Growers, made a number of representations about the seeds including germination rate, purity, and percentage of dormant hard seed. *See id.* at ¶ 62. Plaintiff claims that it purchased seeds from Defendant Organic Growers in reliance on those representations. *See id.* at ¶ 24. Plaintiff further alleges that, in reality, the germination rate was significantly below what Defendant Organic Growers claimed. Moreover, Plaintiff alleges that, contrary to what Defendant Organic Growers represented through Defendant Sack, there was an infestation of male plants and the seeds were of poor quality. *See id.* at ¶¶ 55, 58.

Defendants claim the shipping label and MTA disclaimed any warranties. *See* Dkt. No. 19 at 11. However, the MTA only applied to the 90,000 replacement seeds, not to Plaintiff's initial purchase of 200,000 seeds.[8] *See* Dkt. No. 7 at 9. There is no indication in the complaint or in any of the parties' submissions that Plaintiff signed a similar agreement when it purchased the 200,000 seeds. Furthermore, the shipping label only disclaimed warranty as to the levels of THC in the hemp plants. *See* Dkt. No. 7-5.

Based on these factual allegations, the Court finds that Plaintiff has sufficiently stated a claim against Defendant Organic Growers for breach of express warranty.

With regard to Plaintiff's claim for breach of the implied warranty of merchantability, Section 2-314 provides that "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind." N.Y. U.C.C.

---

[8] Plaintiff does not allege a breach of warranty claim with regard to the 90,000 replacement seeds it received for free from Defendant Organic Growers.

16

§ 2-314(1).  Additionally, to be merchantable, goods must, among other things, be "fit for the ordinary purposes for which such goods are used."  N.Y. U.C.C. § 2-314(2)(c).

To establish that a product was defective, a plaintiff must show that the product in question was not fit for its intended purpose.  *See Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 434 (2d Cir. 2013) (interpreting New York law).  "[T]he . . . inquiry focuses on the expectations for the performance of the product when used in the customary, usual and reasonably foreseeable manners."  *Denny v. Ford Motor Co.*, 87 N.Y.2d 248, 258-59 (1995).  However, the implied warranty of merchantability "'is not a guarantee that the product will . . "fulfill [a] buyer's every expectation."'"  *Factory Assocs. & Exporters, Inc. v. Lehigh Safety Shoe Co. LLC*, No. 05-CV-837, 2007 WL 1834599, *9 (N.D.N.Y. June 26, 2007) (quoting *Ferracane*, 2007 WL 316570, at *8 (quoting *Denny*, 87 N.Y.2d at 258 n.4, 639 N.Y.S.2d 250, 662 N.E.2d 730) (quotation and citation omitted; brackets in original))).  Rather, it provides a minimum level of quality.  *See id.*

In this case, Plaintiff has sufficiently pled a claim for implied warranty of merchantability against Defendant Organic Growers, which is a merchant of hemp seed.  *See generally* Dkt. No. 1 at ¶ 17.  In its complaint, Plaintiff alleges that it had certain expectations about how the seeds would perform based on Defendant Organic Growers' oral and written representations.  *See id.* at ¶ 27.  Plaintiff purchased seeds from Defendant Organic Growers, planted them, and witnessed a performance of the product below what it expected.  *See id.* at ¶¶ 55, 58.  Although the implied warranty of merchantability did not provide a guarantee that the seeds would fulfill all Plaintiff's expectations, Plaintiff's allegations about the quality of the hemp seeds is sufficient at this stage to conclude that the seeds fell below the minimum level of quality that Plaintiff could reasonably have expected.

Based on these factual allegations, the Court finds that Plaintiff has sufficiently alleged a claim for the breach of the implied warranty of merchantability against Defendant Organic Growers and, therefore, denies Defendants' motion to dismiss this claim against Defendant Organic Growers.

## IV. CONCLUSION

After reviewing the entire file in this matter, the parties' submissions and the applicable law and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion to dismiss Plaintiff's Federal Seed Act and California Seed Act claims against all Defendants is **GRANTED**; and the Court further

**ORDERS** that Defendants' motion to dismiss Plaintiff's claim of fraudulent misrepresentation against all Defendants is **DENIED**; and the Court further

**ORDERS** that Defendants' motion to dismiss Plaintiff's breach of express warranty and breach of the implied warranty of merchantability claim against Defendants Eagle Springs Organic LLC and Sack is **GRANTED**; and the Court further

**ORDERS** that Defendants' motion to dismiss Plaintiff's breach of express warranty and breach of the implied warranty of merchantability claim against Defendant Organic Growers LLC is **DENIED**; and the Court further

**ORDERS** that this matter is referred to Magistrate Judge Hummel for all further pretrial matters.

**IT IS SO ORDERED.**

Dated: February 1, 2021
      Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge