**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

**HEMPCHAIN FARMS, LLC**

                              **Plaintiff,**

            v.                                                                   1:19-CV-1364
                                                           (FJS/CFH)

**KENNETH SACK; ORGANIC**
**GROWERS LLC; and EAGLE**
**SPRINGS ORGANIC LLC,**

                              **Defendants.**

---

| **APPEARANCES** | **OF COUNSEL** |
|---|---|
| **FREEMAN HOWARD P.C.**<br>441 East Allen Street<br>P.O. Box 1328<br>Hudson, New York 12534<br>Attorneys for Plaintiff | **PAUL M. FREEMAN, ESQ.** |
| **PECKAR & ABRAMSON, P.C.**<br>1325 Avenue of the Americas<br>10th Floor<br>New York, New York 10019<br>Attorneys for Defendants | **BRIAN D. WALLER, ESQ.** |

**SCULLIN, Senior Judge**

## MEMORANDUM-DECISION AND ORDER

### I. BACKGROUND

Nicolas Guarino, along with several partners, owned and operated Plaintiff HempChain Farms, LLC and its parent company, Naturae LLC. *See* Dkt. No. 48, Defs' Stmt. of Material

Facts, at ¶ 4.[1,2] Plaintiff brokered seed sales for other farmers, meaning that it purchased seeds from various sources and resold them to other farmers. *See id.* at ¶ 6. Defendant Kenneth Sack owned and operated Defendants Organic Growers LLC and Defendant Eagle Springs Organic LLC, which were companies located in Silt, Colorado. *See id.* at ¶ 1. In 2019, Defendant Organic Growers grew, cultivated, and sold hemp and hemp-related products, including two varietals of hemp seed, called "BB1" and "BB2." *See id.* at ¶¶ 2, 10.[3]

As relevant here, Defendants' BB2 hemp was a "hybrid plant" that was a crossbreed of "Cherry Mom" hemp and "Wu #5" hemp. *See id.* at 11.[4] Before selling their seeds, Defendants conducted several tests on them, including with respect to the total CBD content for plants grown from BB2 seeds and their potential active THC content; the BB2 seeds' purity and viability, as estimated in the germination rate; and sex testing to determine the BB2 seeds' female-to-male sex ratio. *See id.* at ¶¶ 12(a)-(c). Based on the results of that testing, Defendant Organic Growers created a seed label for its BB2 seeds that listed Organic Growers LLC as the

---

[1] The facts in this section are taken from Defendants' statement of undisputed material facts. *See* Dkt. No. 48. Plaintiff did not respond to that statement of facts, as required under Local Rule 56.1(b). *See* L.R. 56.1(b). Instead, Plaintiff directed the Court to "its Memorandum-Decision and Order, dated and entered February 1, 2021, together with the affidavits from Nicolas Guarino and the Other Farmers for the relevant facts in this matter." *See* Dkt. No. 56, Pl's Memorandum in Opposition to Summ. J., at 7. The parties are reminded that noncompliance with the Local Rules may be ground for imposition of sanctions, including dismissal of this action. *See* L.R. 1.1(d).

[2] Naturae, which is a separate legal entity from Plaintiff and is not a party to this action, allegedly processed hemp biomass to create hemp products, such as CBD oil. *See* Dkt. No. 48 at ¶¶ 5, 8.

[3] Notably, Defendant Eagle Springs grew and sold organic vegetables; it never grew or sold hemp seeds, nor had it ever held a hemp license. *See* Dkt. No. 48 at ¶ 3.

[4] Plaintiff never purchased BB1 seeds from Defendant Organic Growers, and only the BB2 seeds are at issue here. *See* Dkt. No. 48 at ¶ 10 n.2.

grower, included its web address and phone number, described the varietal of seed as "BB2 Cherry Mom and Wu # 5," listed the origin of the seeds as "Western Slope," stated that the germination rate was 84% (based on the Colorado Seed Laboratory's findings at Colorado State University), warned that certain variables could lead to hemp plants testing higher for THC content and that Defendant Organic Growers made "NO WARRANTY" as to the THC level in BB2, described the seeds as "Feminized" with the explicit warning that there was possibility for intersex traits, pollen progenitors, and males, and instructed buyers to "[w]alk the fields to remove any male plants." *See id.* at ¶ 14 (citing Dkt. No. 50-10). Defendant Sack listed Defendant Organic Growers' products for sale on an online marketplace in the spring of 2019. *See id.* at ¶ 16.

In early May 2019, Plaintiff sought to purchase hemp seeds and resell them to other farmers, so Mr. Guarino contacted a seed broker who sent him information about Defendants' seeds along with seeds from other growers.[5] *See id.* at ¶¶ 17-23. After obtaining Defendants' information from the seed broker, Mr. Guarino visited Defendant Organic Growers's farm on May 18, 2019, at which time he met with Defendant Sack and observed the company's greenhouses. *See id.* at ¶ 24. Defendant Sack also gave Mr. Guarino copies of the Colorado State University report on germination rates, the BB2 seed label, and the Phylos Report on sex testing. *See id.* Defendant Sack showed Mr. Guarino his "results so far" growing BB2, informed Mr. Guarino of the possibility of male plants, and stated that his own trays of plants were experiencing "85 to some being 100 percent" in terms of germination. *See id.* at ¶ 25. Ultimately, acting on behalf of Plaintiff, Mr. Guarino purchased 200,000 BB2 seeds directly

---

[5] It appears that the seed broker may have provided Mr. Guarino with misinformation about the seeds and that the broker caused confusion about the varietals of seeds that Defendants grew. *See* Dkt. No. 48 at ¶¶ 20-23.

from Defendant Organic Growers at $0.65 per seed, for a total price of $130,000. *See id.* at ¶ 26. Plaintiff then resold those BB2 seeds to other farmers at the price of $1.00 per seed. *See id.* at ¶ 28.

When reselling those seeds, Plaintiff allegedly informed certain farms that they would receive different varietals of seeds, such as the "02 Cherry" and "Wu" seeds for one farm and the "Cherry Wu" and "02 Cherry" seeds for another. *See id.* at ¶ 29. One of those farms, called the FarmOn! Foundation, emailed Mr. Guarino in June 2019, complaining that the average germination rate for the "Wu" seeds was roughly 25%, whereas the "Cherry Strike" seeds were a "pleasure to grow" with a 70% germination rate. *See id.* at ¶ 30. According to Defendants, unbeknownst to FarmOn, all of the seeds it purchased from Plaintiff were of the same variety – BB2. *See id.* At the same time, Mr. Guarino also texted Defendant Sack that another farm to whom he had sold the seeds had similar germination issues with a roughly 53% germination rate. *See id.* at ¶ 31. None of Defendant Organic Growers' other customers allegedly complained about the BB2 seeds. *See id.* In response to Plaintiff's complaints, Defendant Organic Growers sent Plaintiff 90,000 replacement BB2 seeds "as an accommodation," which came from the exact same batch of seeds as the initial 200,000 BB2 seeds that Plaintiff purchased. *See id.* at ¶ 34.

In September 2019, Plaintiff's counsel sent Defendants a demand letter requesting that they pay Plaintiff and the other farmers for "actual lost revenue arising from the failed seed germination rates and male plant infestation." *See id.* at ¶ 35. Defendants refused to pay Plaintiff in accordance with the demand letter; and Plaintiff commenced this action. *See id.* at ¶ 37; *see* Dkt. No. 1, Compl. As is relevant here, Plaintiff sought to recover "loss sustained by Plaintiff and the Other Farmers . . . of up to 75% of their crop, the cost of the manpower

necessary to remove the significant number of male plants that infested the fields, a loss of biomass for use in the production of CBD oil, loss of revenue from the sale of CBD oil, loss of revenue from the inability to produce CBD oil for resale to others, together with attorneys' fees and costs[.]"  *See* Dkt. No. 1 at 18.

Defendants have two pending motions before the Court: the first for sanctions against Plaintiff pursuant to Rule 37 of the Federal Rules of Civil Procedure based on Plaintiff's alleged conduct during discovery, *see* Dkt. No. 44, and the second for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, *see* Dkt. No. 47.  Before the Court can address the merits of either of these motions, however, it must consider the threshold issue of whether it has subject matter jurisdiction over this action.

## II. DISCUSSION

In their memorandum of law in reply and further support of their motion for summary judgment, Defendants raise for the first time the argument that Plaintiff does not have standing to bring this action.  *See* Dkt. No. 61, Defs' Reply, at 5-10.  Defendants argue that Plaintiff does not have standing to assert claims against them because Plaintiff has not established that it suffered an injury-in-fact since it did not refund any money to its customers for the allegedly defective seeds; and, therefore, it did not suffer any damages independent of those alleged by its customers.  *See id.* at 8-9.  Defendants also argue that Plaintiff's customers did not validly assign their claims to Plaintiff, and Plaintiff is not the "real party in interest" to the lawsuit.  *See id.*

The Court provided Plaintiff with an opportunity to respond to Defendants' arguments. *See* Dkt. No. 66.  Plaintiff asserts that the Court should not consider Defendants' jurisdictional

arguments raised for the first time in reply papers. *See* Dkt. No. 69 at 1. Plaintiff also responds that it has standing because it kept 5,000 of the seeds that it purchased rather than reselling those seeds, and they exhibited significant deficiencies in germination rates, proliferation of male plants, and lower levels of CBD content than represented. *See id.* at 2. Plaintiff further argues that it is the real party in interest because it "commenced this action on behalf of itself, as well as on behalf of the other farmers who have suffered loss as a direct and proximate consequence of" Defendants' alleged misrepresentations, and the other farmers' claims "*derive* from the contract between [Plaintiff] and [D]efendants[.]" *See id.* at 3-4. Relatedly, Plaintiff contends that the other farmers are intended third-party beneficiaries of the seed contract. *See id.* at 4-5. Lastly, Plaintiff argues in the alternative that, if the Court finds that Plaintiff is not the real party in interest, the Court should permit "substitution of the real party in interest . . . to avoid injustice[.]" *See id.* at 5 (quotation omitted).

With respect to Plaintiff's first argument, the Court notes that "[i]t is axiomatic that a lack of subject matter jurisdiction may be raised at any time '"even by a party who originally asserted jurisdiction."'" *Wight v. BankAmerica Corp.*, 219 F.3d 79, 90 (2d Cir. 2000) (quoting *United States v. Leon*, 203 F.3d 162, 164 n.2 (2d Cir. 2000) (quoting *United States v. Heyward-Robinson Co.*, 430 F.2d 1077, 1080 (2d Cir. 1970))). As such, the Court must address as a threshold matter whether it has subject matter jurisdiction notwithstanding the fact that Defendants did not raise the issue until their memorandum of law in reply and further support of their motion for summary judgment.

"In its constitutional dimension, standing imports justiciability: whether the plaintiff has made out a 'case or controversy' between himself and the defendant within the meaning of Art. III." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "As an aspect of justiciability, the standing

question is whether the plaintiff has 'alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Id.* at 498-99 (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)) (footnote omitted). "Others may benefit 'collaterally' from a resolution favorable to the plaintiff . . . or suffer from an unfavorable one, but the plaintiff's genuinely personal stake ensures the presence of 'that concrete adverseness which sharpens the presentation of issues upon which [a] court so largely depends.'" *Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411, 417 (2d Cir. 2015) (quoting *Baker*, 369 U.S. at 204) (internal quotation omitted). "A plaintiff claiming such a stake must establish, first, that it has sustained an 'injury in fact' which is both 'concrete and particularized' and 'actual or imminent,' *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992) (internal quotation marks omitted); second, that the injury was in some sense caused by the opponent's action or omission, *id.*; and finally, that a favorable resolution of the case is 'likely' to redress the injury, *id.* at 561." *Id.*

"'[L]awsuits by assignees . . . are "cases and controversies of the sort traditionally amenable to, and resolved by, the judicial process."'" *Id.* at 418 (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 285, 128 S. Ct. 2531, 171 L. Ed. 2d 424 (2008) (quoting *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 777-78, 120 S. Ct. 1858, 146 L. Ed. 2d 836 (2000))). However, the assignment must be valid. "'It is essential to an assignment of a right that the [assignor] manifest an intention to transfer the right to another person without further action or manifestation of intention by the [assignor].'" *Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 74 (2d Cir. 2013) (quoting Restatement (Second) Contracts § 324). "'An unequivocal and complete assignment

extinguishes the assignor's rights against the obligor and leaves the assignor without standing to sue the obligor.'" *Phillips v. GM LLC (In re Motors Liquidation Co.)*, 689 F. App'x 95, 96 (2d Cir. 2017) (summary order) (quoting *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, Nat'l Ass'n*, 731 F.2d 112, 125 (2d Cir. 1984)) (other citation omitted)); *see Clarex Ltd. v. Natixis Sec. Am. LLC*, No. 12 Civ. 0722 (PAE), 2012 U.S. Dist. LEXIS 147485, *15-*17 (S.D.N.Y. Oct. 12, 2012); *Amusement Indus. v. Stern*, No. 07 Civ. 11586 (LAK) (GWG), 2011 U.S. Dist. LEXIS 150050, *18 (S.D.N.Y. Dec. 28, 2011). Simply because a party authorizes a plaintiff to sue and collect on its behalf does not necessarily indicate that the party assigned ownership of its claims to the plaintiff. *See Cortlandt St. Recovery Corp.*, 790 F.3d at 418. As the Second Circuit explained,

> "[a] provision by which one person grants another the power to sue on and collect on a claim confers on the grantee a power of attorney with respect to that claim. The grant of a power of attorney, however, is not the equivalent of an assignment of ownership; and, standing alone, a power of attorney does not enable the grantee to bring suit in his own name. *Advanced Magnetics*, 106 F.3d at 17-18 (citations omitted); *cf.* 6A Charles Alan Wright et al., Fed. Prac. & Proc. Civ. § 1545 (3d ed. 2014) ("[T]he mere transfer of a general power of attorney . . . does not create a sufficient interest or right in the chose and the grantor of the power remains the only real party in interest.")."

*Id.* at 418.

For the following reasons, the Court finds that Plaintiff has not alleged that it has a personal stake in this action as to warrant federal-court jurisdiction. Initially, Plaintiff has not alleged that it suffered an injury-in-fact. As stated above, in its complaint, Plaintiff seeks to recover "loss sustained by Plaintiff and the Other Farmers . . . of up to 75% of their crop, the cost of the manpower necessary to remove the significant number of male plants that infested the fields, a loss of biomass for use in the production of CBD oil, loss of revenue from the sale

of CBD oil, loss of revenue from the inability to produce CBD oil for resale to others, together with attorneys' fees and costs[.]"  *See* Dkt. No. 1 at 18.  Significantly, Plaintiff does not allege loss of revenue with respect to the cost of the hemp seeds that it purchased from Defendants.  There is no dispute that Plaintiff purchased 200,000 seeds from Defendants at a cost of $0.65 per seed and that it resold them at a price of $1.00 per seed.  *See* Dkt. No. 48 at ¶ 28.  Mr. Guarino admitted in his deposition that Plaintiff only kept approximately 5,000 seeds, *see* Dkt. No. 50-2, Guarino Dep., at 365:25-366:19, and Plaintiff made $72,000 in profit from brokering those seeds, *see id.* at 371: 4-7.[6]  Plaintiff sold the seeds to various farmers, who are identified only in the complaint as "Other Farmers" and in Plaintiff's submissions as including FarmOn! Foundation, Hideaway Hemp, LLC, Farmers Foundry, High Purity Extractions, and Grow Hemp NY.  *See* Dkt. No. 1 at ¶ 34; Dkt. No. 56 at 6.  Mr. Guarino admitted in his deposition testimony that Plaintiff did not refund any of the other farmers the cost of the seeds after learning that the seeds were allegedly defective.  *See* Dkt. No. 50-2 at 362: 7-9.

As to the manpower necessary to remove the alleged infestation of male plants, Mr. Guarino testified that the only cost it incurred with respect to removing male plants was the cost of laborers – Mr. Guarino being one of those laborers – whom Plaintiff hired to work for High Purity Extractions to remove male plants from their fields.  *See id.* at 362:10-363:8.  However, Mr. Guarino admitted that there were not any records for those payments, as the laborers were paid in cash, and the total amount paid was less than $5,000.  *See id.* at 363:9-25.

---

[6] Although Plaintiff retained approximately 5,000 seeds for itself that it alleges were defective, Plaintiff cannot rely solely on those 5,000 seeds to show that it has standing in this diversity action as it would not reach the $75,000 amount-in-controversy threshold.  *See* Dkt. No. 1 at ¶ 2.

Although Plaintiff alleges loss of revenue from the sale of CBD oil, the inability to produce CBD oil, and the loss of biomass, Mr. Guarino further admitted that Naturae – Plaintiff's parent company that is a separate legal entity and is not a party in this suit – is the company that produces the CBD oil from hemp biomass and sells CBD oil to others, not Plaintiff. *See id.* at 368:10-369:11. Mr. Guarino then admitted that, with respect to Plaintiff's third demand for lost opportunity to generate bulk wholesale CBD oil, Naturae would have suffered that loss, not Plaintiff. *See id.* at 369:18-24. Regarding Plaintiff's demand for damages resulting from loss of biomass, Mr. Guarino testified in his deposition as follows:

> Q: Does HempChain Farms sell biomass that it produces to other farms or does it just provide it to Naturae?
>
> A: It has sold biomass in the past. It has sold flower in the past. Plenty of times.
>
> Q: What percentage of the biomass goes to other farmers?
>
> A: Say out of our flower in 2019, we probably sold like 3 to 5 percent of it in flower form.
>
> Q: So again, how would you calculate the number – the amount of money that HempChain Farms lost by a loss of biomass?
>
> A: I would take a market value of biomass for that year and look at how many pounds we lost.
>
> Q: How many pounds did you lose?
>
> A: Up to and at least 75,000, if not a lot more, right? In between all of the people that purchase this seed, which is what this suit is for. It's not just HempChain Farms. We're representing every single one of these people that grew the seed. If that was the case, then there would be no way to talk about 75,000 pounds.
>
> …
>
> Q: So are you saying that part of your damages calculation is recouping money or damages that were incurred by other farmers?

      A:      All of it is to do that.  None of it is for HempChain Farms.

*See id.* at 372:16-374:8.

As Mr. Guarino admitted, Plaintiff did not lose any of its profits from brokering the seeds, did not lose any opportunities to produce or sell CBD oil, and did not suffer damages from lost biomass; Naturae and the other farmers suffered those losses.  Accordingly, based upon this testimony, the Court finds that Plaintiff has not alleged that it is the real party in interest or that it has suffered a concrete or particularized injury-in-fact.  As such, Plaintiff would only have standing to maintain this action if Naturae or the other farmers assigned their rights to these causes of action to Plaintiff.

There is no evidence that Naturae assigned its rights to its causes of action against Defendants to Plaintiff, nor does Plaintiff make such an allegation in its complaint or assert that argument anywhere in its memoranda.  Instead, Plaintiff alleges in its memorandum in opposition to Defendants' motion for summary judgment that the other farmers assigned their rights to their causes of action against Defendants to it and that it was acting pursuant to those valid assignments.  *See* Dkt. No. 56 at 8-9.  However, Plaintiff did not allege this assignment anywhere in its complaint. *See generally* Dkt. No. 1.  In fact, the only evidence Plaintiff presented that the other farmers assigned it their rights to the causes of action occurred in sworn affidavits that were executed in September 2022, nearly three years after Plaintiff filed its complaint in November 2019.  *Compare* Dkt. No. 1 *with* Dkt. Nos. 57, 58.

In one such affidavit, Jeff Eglintine, the President of Hide Away Hemp, LLC, declared that Hide Away Hemp "assigned [its] cause of action to [Plaintiff] affirmatively."  *See* Dkt. No. 57, Eglintine Aff., at ¶ 3.  In the other affidavit Plaintiff attached, from Mike Matton, a principal of High Purity Extractions, Mr. Matton declared that "High Purity Extractions has assigned [its]

cause of action to [Plaintiff] to pursue in this action." *See* Dkt. No. 58 at ¶ 3. These affiants did not attach any exhibits to their affidavits of communications, writings, or agreements between the parties with respect to those alleged assignments. The Court therefore finds that it is unclear whether Mr. Eglintine and Mr. Matton completely and unequivocally assigned their rights to their causes of action against Defendants to Plaintiff before commencing this action, or if they merely meant to permit Plaintiff to sue Defendants and recover damages on their behalf as a general power of attorney.

With respect to FarmOn, Plaintiff has not provided *any* evidence of assignment of rights to its claims. Plaintiff merely points to Tessa Edick's deposition testimony, as the Chair of the Board and Founder of FarmOn, and alleges that it shows FarmOn's intention to assign its rights.[7] In her deposition, Ms. Edick testified as follows:

> Q: Do you believe that you are a party to this lawsuit?
>
> A: Do I believe I'm a party to this lawsuit? I believe I've been damaged by this entire situation.
>
> Q: But do you believe that you're a party to this lawsuit, HempChain?
>
> A: I don't know what you mean by "party."
>
> Q: Excuse me, FarmOn. Meaning that you are one of the parties, that FarmOn is one of the parties that's suing my client in this lawsuit.
>
> A: I believe that I am involved in this lawsuit to receive damages from the damage caused.
>
> Q: From my client?
>
> A: Yes.

---

[7] Plaintiff also pointed to an affidavit from Evan Kennedy, a farm manager at FarmOn, in which he complained about the germination rates and infiltration of male plants but did not at all discuss FarmOn's assignment of its causes of action to Plaintiff. *See generally* Dkt. No. 14.

- 12 -

>    …
>
> A: I understand that FarmOn Foundation is receiving damages from this situation overall and that Paul [Freeman] was representing us.

*See* Dkt. No, Edick Dep., at 54-4 at 155:4-156:19.

This testimony appears to show that Ms. Edick thought that Paul Freeman, on behalf of Plaintiff, would recover damages for FarmOn from Defendants in this litigation. The Court finds that this does not rise to the level of an unequivocal and complete assignment of rights to a cause of action that is required for Plaintiff to establish standing. Plaintiff also failed to provide any evidence that Farmers Foundry or Grow Hemp NY assigned their claims in this action to it. Therefore, the Court finds that Plaintiff has not shown that any of the "Other Farmers" it identified in its complaint and submissions unequivocally and completely assigned their claims in this action to it.

Plaintiff further contends that the other farmers are the intended third-party beneficiaries of its contract with Defendants, and it may "prosecute[]" those other farmers' losses as the "real party in interest." *See* Dkt. No. 69 at 4-5. Even assuming, without deciding, that the other farmers were the intended third-party beneficiaries of Plaintiff's and Defendants' contract, that would only give *the other farmers* standing to sue under the contract. *See e.g.*, *Meissner v. Syracuse Univ.*, No. 5:20-CV-839 (TJM/ATB), 2021 U.S. Dist. LEXIS 77094, *10 (N.D.N.Y. Apr. 13, 2021) (McAvoy, S.J.).

To the extent that Plaintiff seeks to assert the rights of those third-party beneficiaries without a valid assignment, the Court further rejects Plaintiff's claim. "The determination [of] whether a plaintiff has standing to assert the rights of third parties has constitutional and prudential components." *Lewis v. Thompson*, 252 F.3d 567, 584 (2d Cir. 2001) (citing

*Singleton v. Wulff*, 428 U.S. 106, 112, 49 L. Ed. 2d 826, 96 S. Ct. 2868 (1976)). "First, as is the case with any plaintiff, [it] must meet the constitutional prerequisites of standing: (1) injury-in-fact, (2) causation, and (3) redressability." *Id.* (citing *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 102-03, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) (parenthetical omitted)). "In addition, [it] must satisfy 'prudential' limitations on third-party standing: (1) a 'close relation with the third party' and (2) 'some hindrance to the third party's ability to protect his or her own interests.'" *Id.* (quoting *Lake*, 226 F.3d at 146; *see Secretary of State v. Joseph H. Munson Co.*, 467 U.S. 947, 956, 81 L. Ed. 2d 786, 104 S. Ct. 2839 (1984)). As stated above, the Court holds that Plaintiff has not suffered an injury-in-fact. Plaintiff also has not shown that there is some hindrance to the other farmers' abilities to protect their own interests with respect to their claims against Defendants.[8] As such, Plaintiff cannot assert the rights of the other farmers as third parties in this action.

Lastly, Plaintiff may not simply substitute the other farmers for itself as it requests in its reply brief. A plaintiff may only rely on Rule 17(a)(3) of the Federal Rules of Civil Procedure to remedy defects in standing "where the plaintiff clearly had standing on another claim that it brought." *Cortlandt St. Recovery Corp.*, 790 F.3d at 423 (quotation omitted). "In other words, in the absence of a plaintiff with standing, this lawsuit was a nullity, and there was therefore no lawsuit pending for the real party in interest to 'ratify, join, or be substituted into' under Rule 17(a)(3) or otherwise." *Id.* (quoting [Fed. R. Civ. P. 17(a)(3)]). Therefore, since Plaintiff is not the real party in interest and has not suffered an injury-in-fact, the Court finds that substitution of the other farmers as plaintiffs would be inappropriate.

---

[8] The Court notes that the other farmers are well within the six-year statute of limitations for a breach of contract action in New York if they so choose to assert their claims.

Accordingly, after considering both parties' arguments on the issue, the Court finds that Plaintiff did not suffer any injury-in-fact, the other farmers did not properly assign their rights to their causes of action, and substitution is inappropriate; and, therefore, the Court dismisses Plaintiff's complaint because it does not have subject matter jurisdiction over this action.

### III. CONCLUSION

After carefully considering the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's complaint is **DISMISSED without prejudice** for lack of subject matter jurisdiction; and the Court further

**ORDERS** that all other pending motions, including Defendants' motions for summary judgment and sanctions, *see* Dkt. Nos. 44 and 47, are **terminated as moot**; and the Court further

**ORDERS** that the Clerk of the Court shall close this case.

**IT IS SO ORDERED.**

Dated: March 24, 2023
Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge